IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 05-cv-00407-PSF

SUSAN M. GILBERT,

      Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

      Defendant.

---

## ORDER ON SOCIAL SECURITY APPEAL

---

This matter was set for oral argument on March 6, 2006 at 9:00 a.m. on plaintiff's appeal of denial of social security benefits.  The Court has received the arguments and submissions of counsel, vacates the hearing set for March 6, 2006, and enters the following Order.

**BACKGROUND**

Plaintiff Susan Gilbert appeals from the decision of the Commissioner denying social security disability benefits. The decision of the Commissioner became final on January 7, 2005 when the Appeals Council notified plaintiff that it found no reason to review the decision of the Administrative Law Judge, which had been entered on September 22, 2004.  Plaintiff timely filed her appeal from the final decision of the Commissioner on March 3, 2005.  The Court has jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

Plaintiff filed her claim for benefits on February 3, 2000, seeking disability benefits beginning September 18, 1999, due to peripheral neuropathy, fibromyalgia[1], disc disease, arthritis, memory and judgment problems, anxiety, depression and sleep apnea (AR[2] 106).  Upon review her application was denied by the Administrative Law Judge on June 21, 2001 (AR 19-24).  On or about October 15, 2001, while the matter was on appeal to the Appeals Council, plaintiff filed a second claim for disability (AR 700-02).  Her claimed disability included fibromyalgia, chronic pain, DJD (degenerative joint disease), and depression (AR 723).  On April 26, 2002, the Appeals Council denied plaintiff's request for review of the ALJ's decision (AR 8-9).  Thereafter plaintiff filed an appeal from the Commissioner's decision in this district court.

On August 3, 2003, the Commissioner stipulated to a remand of the case from the district court to the Appeals Council for additional administrative proceedings (AR 422, 426).  On October 20, 2003, the Appeals Council, in turn, remanded the case back to the Office of the Administrative Law Judge, noting that the medical record contained an opinion from Gordon Neligh, a psychiatrist, who opined that claimant is "disabled," (AR 265) and directed the ALJ to consider this opinion and ascertain its appropriate probative value (AR 424-25).

In accordance with that order, the ALJ held a further hearing on April 20, 2004, at which time plaintiff appeared represented by counsel (AR 385-415).  Also appearing

---

[1]   Fibromyalgia is defined as a disorder characterised by muscle pain, stiffness and easy fatigability.  The cause is unknown and an estimated 3 million are affected in the USA. http://cancerweb.ncl.ac.uk/cgi-bin/omd?fibromyalgia.

[2]   The Administrative Record in this case (AR) consists of one volume, pp. 1-974.

at the hearing was a vocational expert, Louis Phillips, and a medical expert, Sandra Rhodes, Ph.D., a licensed psychologist.  At the hearing the ALJ considered both the original application for benefits and the supplemental application filed in October 2001 (*see* AR 370).  On September 22, 2004, the ALJ issued her decision denying plaintiff's disability claim (AR 370-84).  On January 7, 2005, the Appeals Council issued its final denial of review (AR 351-54).  Thereafter plaintiff timely filed her appeal in district court.

**THE ALJ'S DECISION OF SEPTEMBER 22, 2004**

In her written decision of September 22, 2004, the Administrative Law Judge first denied plaintiff's application for benefits at step four of the five-step process.  *See generally Williams v. Bowen,* 844 F.2d 748, 750-52 (10th Cir. 1988).  The ALJ found that plaintiff had the residual functional capacity to return to her past relevant work variously described as a "nurse consultant" and "telephone triage nurse." (AR 371, 381, 383).  Alternatively, the ALJ found that plaintiff's RFC permitted her to perform other jobs which exist in significant numbers in the national economy (AR 382, 383).

In reaching her determination, the ALJ found plaintiff was suffering from physical impairments including fibromyalgia, obesity, peripheral neuropathy, each of which constitute "severe" impairments under the Social Security Act (AR 371).  She also found that plaintiff was suffering post-operative from a left knee arthroplasty[3] (*Id.*).  The

---

[3]  Arthroplasty is defined as "the surgical repair of a joint." http://cancerweb.ncl.ac.uk/ cgi-bin/omd?arthroplasty.  The Court understands that the knee arthroplasty referred to by the ALJ was the replacement of the knee joint discussed below.

ALJ nonetheless found that these combined ailments did not meet the listed impairments of Appendix 1 to Subpart P of the Social Security regulations (AR 375), a finding which plaintiff apparently does not challenge on this appeal.  The ALJ also found that plaintiff's other medical complaints were not severe as they did not cause more than a minimal impact on her capacity for work-like function for a duration of 12 continuous months (AR 372).  It appears that plaintiff does not challenge this finding on appeal.

The ALJ determined that notwithstanding her physical impairment due to fibromyalgia, obesity, peripheral neuropathy and post-operative knee arthroplasty, plaintiff had the residual functional capacity to lift and carry 10 to 15 pounds occasionally and 10 pounds frequently, that she could sit for 6 hours in an 8-hour day with the opportunity to stand and stretch each hour and could stand and walk for 1 to 2 hours each time (AR 383).  She also found that plaintiff was able to occasionally stoop, crouch and climb stairs, but never crawl.  She found that she should avoid concentrated exposure to temperature extremes, wetness, fumes, odors, dust, gases and poor ventilation, and even moderate exposure to unprotected heights, and should not drive as part of her work duties (AR 381, 383).  The Court notes the ALJ made no findings as to limitations on plaintiff's ability to reach, finger, handle or push or pull.  Rather, the ALJ stated that the objective and narrative medical evidence was not persuasive in establishing more than a "minimal functional limitation" caused by plaintiff's bilateral thumb surgeries, which has persisted continuously for more than 12 months (AR 382).

The ALJ also found that plaintiff's mental health complaints, including depression, anxiety, cognitive deficits in terms of memory and judgment difficulty, were not established as severe impairments under the Act by the evidence in the case (AR 372-73).  The ALJ specifically found that plaintiff had only slight mental deficits in terms of understanding, remembering and carrying out both simple and detailed work instructions, and was only slightly limited in using judgment in making simple work decisions, in responding appropriately to coworkers, supervisors and the public, and in responding appropriately to changes in the routine work setting (AR 383).  She found that claimant is moderately limited in responding appropriately to work pressure.

As previously stated, notwithstanding these limitations and impairments, the ALJ concluded could return to her past relevant work as a nurse consultant or telephone triage nurse (AR 371, 381, 383).  Alternatively, the ALJ found that plaintiff could perform "other sedentary jobs" which exist in significant numbers in the national economy (AR 382).  Based on testimony from the vocational expert, the ALJ found that such other work included employment as a final assembler of optical goods and food and beverage order clerk (AR 382, 383).  Accordingly, the ALJ determined that plaintiff was not disabled as defined in the Act (*id.*).

**PLAINTIFF'S APPEAL**

On appeal plaintiff argues that substantial evidence in the record does not support the ALJ's determination for several reasons.  She first argues that the ALJ did not give proper weight to the opinions of plaintiff's treating physicians, particularly Dr. Stuart Kassan, who served as plaintiff's treating rheumatologist (Plaintiff's Brief at

6-9, 13-14), Dr. Jacob Pomerantz, plaintiff's treating psychologist (*id.* at 10,14), and

Dr. Gordon Neligh, a psychiatrist who supposedly treated plaintiff (*id.* at 10-14).  She

also argues that the ALJ did not properly evaluate her complaints of pain, stiffness and

fatigue relating to her fibromyalgia (*id.* at 15).  She further argues that as a result of

these errors in describing plaintiff's limitations the ALJ did not present a proper

hypothetical to the vocational expert, and even given the limitations found by the ALJ,

she misstated the skill level of plaintiff's past relevant work (*id.* at 16).  Moreover,

plaintiff argues that there was insufficient evidence of record that plaintiff could perform

the jobs which the ALJ found were accessible to plaintiff, and in any event, there was

insufficient evidence to show that such jobs existed in significant numbers in the

regional economy (*Id.* at 17).  Finally she argues the ALJ did not make a proper

determination as to plaintiff's credibility.

**ANALYSIS**

### A.   Whether the ALJ Properly Found That Plaintiff Could Return to Her Past Relevant Work

Although not expressly or independently raised by plaintiff as an issue on

appeal, the Court first considers whether this case should be remanded given the ALJ's

finding in her September 22, 2004 decision that plaintiff could perform her past relevant

work, when in her June 21, 2001 decision, as plaintiff does point out (Plaintiff's Brief at

1) the ALJ found that plaintiff could **not** perform her past relevant work (AR 681, 684).

The Court first finds that this apparent inconsistency is explained by the fact that

in her earlier decision the ALJ evaluated whether plaintiff could return to past relevant

work as a registered nurse (AR 681), a job the ALJ described as a skilled position, which requires a medium level of work and is often quite stressful (*id*.).  The ALJ determined that plaintiff could not return to her past relevant work as a registered nurse (*id*).  In her latter decision, the ALJ found, as noted above, that the plaintiff's past relevant work also included work as nurse consultant, a position that is also skilled, but sedentary (AR 371).  It is to the position of nurse consultant, or telephone triage nurse, that the ALJ found plaintiff could return in her decision of September 22, 2004 (AR 381).  Thus, the apparent inconsistency is resolved by the difference in positions that were found to have been relevant past work.

Moreover, this latter position of telephone triage nurse was described by the plaintiff in her testimony at the hearing on April 20, 2004 as involving work where she primarily sits, speaking over a telephone headset which has a "tether" that allows her to stand and move about, and at which she types on a computer keyboard and consults reference books, apparently relating to insurance claims (AR 407-08).  The vocational expert, after hearing such testimony, opined that this position was most consistent with the DOT (Dictionary of Occupational Titles) definition of the position of "nurse consultant," DOT number 075.127-014, a sedentary position, that "would be skilled at seven" (AR 408).  The Court understands this testimony to mean that the vocational expert found this position had a SVP (Specific Vocational Preparation) value of 7.  That value appears in the DOT description of the position.  As defined in the DOT, an SVP is

> the amount of lapsed time required by a typical worker to
> learn the techniques, acquire the information, and develop
> the facility needed for average performance in a specific

> job-worker situation.  This training may be acquired in a
> school, work, military, institutional, or vocational environ-
> ment.  It does not include the orientation time required of a
> fully qualified worker to become accustomed to the special
> conditions of any new job. Specific vocational training
> includes:  vocational education, apprenticeship training,
> in-plant training, on-the-job training, and essential
> experience in other jobs.

Dictionary of Occupational Titles, Appendix C.  According to the appendix definition,

a SVP level of 7 requires specific vocational preparation of "over 2 years up to and

including 4 years."  *Id.*  The definition further provides that the training includes training

given in the following circumstances: "Vocational education (high school; commercial or

shop training; technical school; art school; and that part of college training which is

organized around a specific vocational objective)"  (*id.*).

Plaintiff testified at the hearing held on April 5, 2001, that she had 16 years of

schooling, including graduating from college in 1985 with a bachelor of science in

nursing (AR 29).  At the hearing held on April 20, 2004, she restated that she had a

B.S. in nursing.  The record thus supported a finding that plaintiff had at least four

years of training in the field of nursing, which would support a finding that she could

perform nursing related work with an SVP of 7.

Relying upon plaintiff's testimony, including her description of the position of

telephone triage nurse, and the VE's testimony, the ALJ found that this position does

not require performance beyond plaintiff's residual functional capacity (AR 381).

On appeal, the plaintiff argues that the ALJ's finding that plaintiff could return to

her past relevant work even as a telephone triage nurse is not supported by the record.

In presenting the hypothetical to the vocational expert, the ALJ described a hypothetical person with plaintiff's residual functional capacity, and limited the hypothetical person to semiskilled work with an SVP of 3 or 4, or unskilled work with an SVP of 1 or 2 (AR 409).  As noted above, the position of nurse consultant carries an SVP of 7.  Thus, when the vocational expert here was asked whether the hypothetical person described in the hypothetical could do claimant's past relevant work, the VE testified: "All past relevant work would be out, Judge, based only on the limitation you placed on SVP level." (AR 409).   Plaintiff, understandably, argues that there was therefore no basis for the ALJ to find that plaintiff could return to her past relevant work.

While the plaintiff correctly cites to what the vocational expert stated, it seems apparent from the record that either the ALJ when framing the hypothetical was speaking about the SVP levels only for other possible jobs that could be performed, or she misspoke insofar as she assumed that plaintiff had a SVP level of only three or four with respect to her past relevant work as a nurse consultant.  Clearly, the ALJ understood that the nurse consultant position had a SVP of 7 (*see* AR 381).

As noted above, the record certainly supported a finding that plaintiff had the requisite 2 to 4 years training included in a SVP rating of 7.  Thus, notwithstanding the question presented to the vocational expert and his answer, there is substantial evidence in the record that plaintiff had the specific vocational preparation to perform her past relevant work as a nurse consultant or telephone triage nurse as that position is defined in the DOT.  The ALJ is not bound by the VE's responses to hypothetical questions that include assumed restrictions not ultimately found by the ALJ to be

9

supported by the record as a whole.  *See e.g. Daniels v. Apfel*, 242 F.3d 388 (Table),

2000 WL 1761087 *5 (10th Cir. 2000).  Here where the record supported that plaintiff

had the requisite experience in the nursing field, the ALJ did not err in determining that

plaintiff could return to her past work, defined in the DOT as nurse consultant.  The

question remains whether she had the physical and mental residual functional capacity

to perform that position or others.

   **B.     Whether the ALJ Gave Proper Weight To the Opinions of the Treating
           Physicians.**

           1.     *Drs. Gordon Neligh and Jacob Pomerantz*

   As noted above, it appears that plaintiff is asserting that the ALJ did not give

proper weight to the opinions of Drs. Gordon Neligh and Jacob Pomerantz, who treated

plaintiff for mental health issues.  It appears that the ALJ did give little or no weight to

the opinion of Dr. Neligh (AR 373-74).  It does not appear that the ALJ rejected the

opinions of Dr, Pomerantz, but simply found that they did not support a finding that

plaintiff was disabled.

   Dr. Neligh's opinion, which appears in a 2-page letter dated March 14, 2000 (AR

264-65) states a conclusion that plaintiff is "disabled." (AR 265).  As the ALJ correctly

recognized, that determination is reserved for the Commissioner and a doctor's opinion

on such an ultimate issue is not binding (AR 374).  Dr. Neligh's letter does not docu-

ment any treatment of plaintiff, nor do medical records of treatment by him appear to

support his conclusion.  As the ALJ noted, Dr. Neligh's letter simply states that plaintiff

came to him with a diagnosis of depression, anxiety and loss of memory and

intellectual function, some of which he states was documented by Dr. Pomerantz (AR

264).  Apparently, Dr. Neligh screened plaintiff for sleep apnea, found a positive result,

and gave her a CPAP (continuous positive airway pressure) apparatus (*id.*).  He noted

that this "improved her mood and intellectual function." (AR 265).  He also noted that

plaintiff reported that her "chronic pain is reduced."  (*Id.*).  He also noted that she

reported that her lower lumbar pain remains, and suggested that this probably was as a

result of an abnormal gait from a previously tender hip joint that may be treatable by

physical therapy.  He stated that her "health care team is working" on her multiple

problems, and "things are looking better" (*id.*).  He nonetheless concluded that plaintiff

"remains disabled."  (*Id.*).

The ALJ rejected the conclusion of disability for the reasons set forth above, as

well as because it was not supported by any examination signs or findings, and was

inconsistent with actual treatment records of Dr. Pomerantz that preceded Dr. Neligh's

opinion (AR 374).  She also found that Dr. Neligh's opinion did not specify any degree

of functional limitation, and therefore was not considered persuasive in establishing the

existence of a sever mental impairment in plaintiff, much less a disabling one (*id.*).

First, the Court finds that the ALJ rightly stated that the conclusion as

to disability is an issue reserved to the Commissioner and the opinion of a treating

physician on this issue is not entitled to any special weight.  *See* 20 C.F.R.

§ 404.1527(e)(1).

In addition, 20 C.F.R. § 404.1527(d)(2) provides that the treating physician's

opinion may be entitled to controlling weight, but only to the extent that it is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence" in the case record.  Here, the ALJ found a lack of clinical and laboratory findings to support the opinion, and as noted there were no findings made by Dr. Neligh at all other than what was in his letter. The ALJ found, as well, substantial other medical evidence that contradicted the conclusions of Dr. Neligh.

The regulation also provides that when discounting the weight to be given to medical opinions from treating physicians, it is incumbent on the ALJ to give good reasons for the weight given to a treating physician's opinion.  20 C.F.R. § 404.1527(d)(2).  The ALJ did give good reasons for not giving controlling weight to the opinion of Dr. Neligh, as discussed above.  This Court finds no error in the ALJ's decision to give no weight to Dr. Neligh's conclusory opinion.

Plaintiff also appears to argue that the ALJ wrongly failed to give controlling weight to the opinions of Dr. Pomerantz (Plaintiff's Brief at 10-13).  However, unlike the situation with respect to Dr. Neligh, the ALJ did not entirely reject the opinions of Dr. Pomerantz.   Indeed, in rejecting the opinion of Dr. Neligh, the ALJ states she relied on the findings of Dr. Pomerantz, which she found to be inconsistent with Dr. Neligh's opinion.  Rather, the ALJ found that the opinions of Dr. Pomerantz did not support a finding of mental health impairment, "which more than minimally impacts the claimant's ability to work." (AR 374).

Dr. Pomerantz appears to have initially treated plaintiff for the period of time from October 13, 1999 (*see* AR 221) through July 5, 2000 (*see* AR 304), when she was

12

discharged from his care.  In his initial evaluation of October 1999, as the ALJ found and as plaintiff candidly states in her brief on appeal, Dr. Pomerantz' repeatedly reported observations of "mild" impairments or difficulties, or "possible" difficulties with plaintiff's cognitive functions (*see* AR 225-228), but no serious or severe difficulties that would be reflective of a severe mental impairment.  His intermittent clinical follow up notes reflect generally that plaintiff was "doing well" (AR 219-20), and that her mood was within normal limits (AR 215-18, 308).  By July 2000, plaintiff reported no depressive or anxiety symptoms to Dr, Pomerantz and her mood was within the normal range.  She reported better sleep, decrease in pain, increased strength and stamina.  She apparently told Dr. Pomerantz that she could proceed on her own, and would call if she runs into difficulty (AR 304).  There do not appear to be any opinions in Dr. Pomerantz' notes that indicate that plaintiff is suffering from severe cognitive or mental difficulties.

Dr. Pomerantz apparently treated plaintiff again in the period of February-March 2003 (AR 500-02).  Although his notes from that brief period of treatment reflect depression and anxiety over "marital difficulties" (AR 502), his notes do not reflect any severe cognitive difficulties (AR 500-02).  Plaintiff's GAF (Global Assessment of Function) score was 61, reflective of only a mild level of impairment.  The notes from March 3, 2003 indicate that plaintiff's mood was improving, that she was using "cognitive strategies effectively" and that again felt she could proceed on her own (AR 500).  Given the contents of Dr. Pomerantz' notes and reports, the Court can not find that the ALJ failed to give appropriate weight to his opinions as a treating doctor.

13

2.    *Dr. Stuart Kassan*

Dr. Stuart Kassan, who specializes in arthritic and rheumatic diseases, apparently began seeing plaintiff in January 2000 (AR 202-04).  She was referred to him for review of "probable" fibromyalgia syndrome, low positive ANA[4], degenerative joint disease, history of peripheral neuropathy, depression and gastrointestinal bleeding (AR 202).  After the initial examination, Dr. Kassan observed that plaintiff "had a low positive ANA titer of 1:80," and "probably does have a fibromyalgia type syndrome," but "it will remain to be seen whether the low positive ANA is of significance." (AR 203-04).

Dr. Kassan apparently did not see plaintiff again until January 11, 2001, at which time he reported that an x-ray showed "[m]ild degenerative change bilateral knees" and "[m]inimal joint space narrowing of a marked degree bilaterally" but no change from April 2000 (AR 331).  He also reported that the spinal x-rays showed "[m]ild to moderate disc space narrowing L5/S1 with facet sclerosis mid and lower lumbrosacral spine" but no change from September 2000 (*id*.).  Although a blood test was run on that visit, the Court finds no value for plaintiff's ANA titer in the report (AR 329-30).

Dr. Kassan saw plaintiff again on February 7, 2001, concluded that her condition was "somewhat improved" and that she had "[d]ecreased left knee symptomology with

---

[4]    ANA refers to antinuclear antibodies, which defined as "antibodies that react against components of the cell nucleus such as DNA, RNA, histone or non-histone proteins.  These antibodies are present in a variety of immunologic or autoimmune diseases including systemic lupus erythematosus, systemic sclerosis, scleroderma, Sjogren's syndrome, rheumatoid arthritis, polymyositis, dermatomyositis and in persons taking hydralazine, procainamide or isoniazid.  A serologic measurement for antinuclear antibodies can aid in the diagnosis of unexplained arthritis, rashes or chest pains. http://cancerweb.ncl.ac.uk/cgi-bin/omd?ANA

increased exercise." (AR 326). He reports that an MRI "apparently was normal" and "[n]o further treatment is indicated except Promethazine as needed." (*Id.*). Specifically he observed "[m]arked decrease in medial joint line tenderness over the knees bilaterally," and "[s]ome decreases in paraspinal tenderness over the C-spine, T-spine and LS-spine." (*Id.*). He also noted no synovitis[5] was present (*id.*). Although a blood test was run on that visit, the Court again finds no value for plaintiff's ANA titer in the report (AR 327-28).

Dr. Kassan saw plaintiff once again on March 7, 2001, when she reported increased joint aching over the LS-spine and hips (AR 325). He observed "some paraspinal tenderness over C-Spine, T-Spine and LS-Spine," but her straight leg raise was negative (*id.*). He suggested there was increased joint symptomatology, fibromyalgia, positive ANA and DJD (a form of arthritis) (*id.*). The Court does not find, however, any blood test results from that date supporting the comment regarding the positive ANA, unless he is referring to an earlier time period.

On April 3, 2001, Dr. Kassan completed a work capacity evaluation form (AR 32-36) on which he indicated plaintiff could not do "work activity on any regular and sustained basis" (AR 332). As to plaintiff's residual functional capacity he indicated that she could lift 10 to 15 pounds occasionally, less than 10 pounds frequently, that she could stand and walk less than one hour per day and 10 minutes at one time, that

---

[5] Synovitis is defined as an "[i]nflammation of a synovial membrane. It is usually painful, particularly on motion and is characterized by a fluctuating swelling due to effusion within a synovial sac. http://cancerweb.ncl.ac.uk/cgi-bin/omd?synovitis

she could sit up to two hours per day and 30 minutes at one time, and could never

climb, stoop, crouch, kneel, or crawl (AR 333-34).  He stated that she was limited in

reaching handling, fingering, feeling, pushing and pulling, quantifying only that she was

limited to occasional handling, fingering and feeling (AR 335).  He stated that he did

not expect these limitations to change within the next 12 months (AR 336).

The ALJ afforded Dr. Kassan's RFC assessment "minimal weight" (AR 379).

In explaining her reasoning, the ALJ stated that Dr. Kassan's own clinical treatment

records failed to reveal any significant low back findings that would substantiate the

limitations on sitting (AR 379).  She also stated that there were only "mild findings"

concerning plaintiff's bilateral knee problems, inconsistent with the assessment that she

could stand and walk for only the limited time he reported (*Id.*).  The ALJ further pointed

out that later MRI findings of November 2001 (*see* AR 339) showed only mild

degenerative lumbar changes, and EMG findings from December 2001 (*see* AR 340)

concerning her neuropathy were similarly considered only "very mildly abnormal, at

most."  (*Id.*).

Here, the ALJ did not give controlling weight to the RFC opinion of Dr. Kassan, a

treating physician, due to a lack of sufficient clinical and laboratory findings in his own

records to support such an opinion as to plaintiff's limitations.  The Court's review of the

clinical notes of Dr. Kassan confirms the ALJ's position.  He may well have been right,

but the records were not complete enough to mandate the ALJ's acceptance of his

conclusions.  The ALJ found, as well, other medical evidence that contradicted the

conclusions of Dr. Kassan as to plaintiff's RFC.  In addition, the ALJ gave reasons

16

for the minimal weight given this treating physician's opinion as required by 20 C.F.R. § 404.1527(d)(2).  This Court finds no error in the ALJ's decision to give only minimal weight to Dr. Kassan's RFC opinion of April 2001.

Dr. Kassan also completed a work capacity evaluation form dated April 18, 2003 (AR 657-661), on which he again indicated plaintiff could not do "work activity on any regular and sustained basis" (AR 657).  As with his prior opinion, he stated that plaintiff had limitations of lifting up to 10 pounds occasionally, and limitations of standing, walking and sitting of less than 1 hour per day and 15 to 20 minutes at a time (AR 658-59).  He again stated that she could never climb, stoop, crouch, kneel, or crawl (AR 659).  He stated that she was limited in reaching, handling, fingering, feeling, pushing and pulling, quantifying this time that she should **never** handle, finger or feel (AR 660).  He also added restrictions of no working at heights, moving machinery, at temperature extremes, or with dust, noise, fumes, humidity or vibration (AR 661).  He again stated that he did not expect these limitations to change within the next 12 months (AR 661).

The ALJ did not give this opinion of Dr. Kassan controlling weight, finding that other evidence in the record diminished the "persuasiveness" of the assessment at least with respect to his limitations of "never" handling, fingering or feeling (AR 379-80).  She also found that Dr. Kassan's own treatment records did not support his opinions of a disabling level of impairment (AR 380).  On the other hand, the Court notes that some of the opinions of Dr. Kassan were included in the RFC (residual functional capacity) assessment developed by the ALJ, including his opinions that plaintiff should not be moderately exposed to working at unprotected heights, or be subject to concentrated

17

exposure to temperature extremes, or work with dust, noise, fumes, humidity or vibration (AR 383). In giving her reasons for not giving controlling weight to the opinions of Dr, Kassan, the ALJ discussed the plaintiff's medical treatment record for the period of 2002 through 2003, which she found inconsistent with Dr. Kassan's opinions.

In August 2002 Dr Kassan referred plaintiff to Dr. Thomas Fry, a hand specialist, because she reported increased pain in both thumbs (AR 460). Dr. Fry recommended arthroplasty on her left thumb (*id.*), that is surgical repair of the thumb joint. Surgery was performed on plaintiff's left thumb on November 7, 2002 (AR 459). Dr. Fry's post-surgical notes of December 5, 2002 report that plaintiff had "excellent stability at the CMC level both with anterior, posterior and lateral movements. There is no grittiness and no grinding," and that plaintiff did not report much pain (AR 458). Dr. Fry's notes of January 9, 2003, report that plaintiff is capable of work in the light category, meaning 10 pounds or less for pushing, pulling, gripping and grasping with left hand (AR 457). His notes of February 6, 2003, state that he thinks it is safe for her to start crocheting as long as she pays attention to her hand and wears a wrap as needed (AR 457). He notes he will schedule her for CMC arthroplasty on her right thumb (*id.*). Dr. Fry apparently performed the right thumb surgery in late March or April 2003 (*see* AR 608), reporting by May 1, 2003, that plaintiff was "doing very well with early range of motion and still good stability and alignment of the CMC without pain." (AR 608). The ALJ did not find any subsequent treatment records document any specific hand or thumb complaints (AR 379).

In August 2002, an MRI of plaintiff's left knee revealed significant osteoarthritis and a possible degenerative tear (AR 450). She was referred to Dr. Roger Greenberg, an orthopedic surgeon, who states in his September 25, 2002 examination notes that she will probably need a "total knee arthroplasty" (AR 448). She apparently received pain injections at least twice in 2003 (*see* AR 616-17) but eventually underwent surgery by Dr. Greenberg for a total left knee replacement on August 21, 2003 (AR 625). Followup notes by Dr. Greenberg dated November 19, 2003, indicate knee flexion past 110 degrees, dramatically improved gait, and no further need for formal therapy (AR 615). Dr. Kassan's notes of November 18, 2003 state plaintiff "has done fairly well" following the surgery (AR 625). Dr. Greenberg's followup notes of January 28, 2004 state that plaintiff's knee was then coming to full extension and flexes past 120 degrees. She still had some quadriceps atrophy, but would continue to work on quad strengthening. (AR 614). No further medical treatment notes from Dr. Greenberg are found in the record.

However, Dr. Greenberg did record in his January 2004 notes that plaintiff experienced left shoulder discomfort after "swinging a 20-pound turkey forward." (AR 614). He thought that might indicate shoulder impingement syndrome (*id.*). Dr. Kassan's notes of January 21, 2004 indicate that she was to see Dr. Greenberg for treatment of her left shoulder problem (AR 623). His followup notes of February 25, 2004 indicate that her left rotator cuff was feeling better after an injection with Dr. Greenberg. (AR 622). Dr Kassan's last notes prior to the April 2004 hearing before the ALJ, dated March 23, 2004, make no mention of her shoulder problem, report that

19

plaintiff had a marked decrease in paraspinal tenderness over the C-spine, T-spine and LS-Spine, and overall was doing somewhat better.  (AR 621).

On review of these records, the ALJ found that Dr Kassan's clinical findings, and those of other treating and examining sources, not only supported an ability to perform sedentary work, but they also failed to establish the manipulative limitations stated by Dr. Kassan in his April 2003 opinion, due to either her thumb surgeries or her left shoulder impingement (AR 380).  The ALJ cited to the above medical treatment records in concluding that Dr. Kassan's April 2003 assessment, including the limitation that she could "never" feel, handle or finger for at least 12 months, is inconsistent with post-operative treatment notes and the indication by Dr. Fry that she could begin crocheting. She therefore gave little or no weight to Dr. Kassan's opinion on this limitation (AR 379-80).

As stated above, 20 C.F.R. § 404.1527(d)(2) provides that the treating physician's opinion may be entitled to controlling weight, but only to the extent that it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record.  Here, the ALJ found a lack of clinical and laboratory findings to support the opinion of Dr. Kassan, found substantial other medical evidence that contradicted the conclusions of Dr. Kassan, and gave reasons for the limited weight given to a treating physician's opinion.  The Court finds no error in the weight given by the ALJ to the April 2003 opinion of Dr. Kassan.

**C.     Whether Plaintiff's RFC Was Correctly Found**

1.     *Plaintiff's Mental Health*

Having rejected the opinion of Dr. Neligh, and having considered the opinion of

Dr. Pomerantz, the ALJ found no serious cognitive impairment of plaintiff that would

prevent her from work-related functioning (AR 375).  In reaching this conclusion, the

ALJ credited a consultative evaluation by Dr. Brett Vallette, a clinical psychologist,

based on an examination of March 27, 2001 (AR 266-71), a second evaluation

performed on March 31, 2002 by Dr. John Burt, a clinical psychologist (AR 971-74) and

the testimony received at the hearing of September 22, 2004 from Dr. Sandra Rhodes,

a psychologist (AR 402-06).  She also relied on a finding from a November 21, 2003

neurological examination by Dr. London who found that plaintiff's "abnormal mental

status" was apparently due to her being overmedicated (*see* AR 673).

Dr. Vallette opined that plaintiff did not show any cognitive impairment at the

time of his examination, nor any impairment in mental functioning (AR 271).  He stated

that she has a very mild dysthemia,[6] did not appear depressed "at all" on the date of

the exam, and participated fully in the evaluation (*id.*).

--------

[6]   Dysthymia is defined as: "A type of depression involving long-term, chronic
symptoms that do not disable you, but keep you from functioning at full steam or from feeling
good. Dysthymia is a less severe type of depression than what is considered a major
depression. However, people with dysthymia may also sometimes experience major
depressive episodes."
http://cancerweb.ncl.ac.uk/cgi-bin/omd?query=dysthymia+&action=Search+OMD

Based on his examination of plaintiff, Dr. Burt reported "only slightly impaired delayed memory" in remembering words (AR 973), "good concentration" in her ability to subtract (*id.*), an "above average general fund of knowledge" (AR 974), "good abstract reasoning abilities" (*id.*), and good judgment (*id.*).  He also reported a GAF score of 60, again indicating only a mild impairment (*id.*).  He also opined that she could manage her own funds at this time (*id.*).

Dr. Rhodes testified at the hearing on April 20, 2004 that based on her review of the records from Drs. Vallette, Pomerantz and Burt, she found plaintiff had mild impairments in schedule 12.04 (referring to affective disorders listed in 20 C.F.R. Part 404, Subpt. P, App. 1), and also anxiety related disorder, but not sufficient to be categorized under the necessary criteria of the above schedule to be classified for affective disorder or anxiety disorder (AR 402).  She also found that plaintiff had mild impairments with respect to the activities of daily living, social functioning, concentration, persistence and pace, but no episodes of decompensation (AR 402-03).  She also testified that plaintiff would have a "slight" impairment in carrying out simple instructions, detailed instructions, and make judgments on simple work-related decisions (AR 403).  She testified that plaintiff would have slight impairment in responding appropriately to supervisors, coworkers, and the general public (AR 404).  She would have a moderate impairment in responding appropriately to "work pressures in a usual work setting," but only slight impairment in responding "appropriately to changes in a routine work setting."  (AR 404).

Based on this evidence of record, the Court finds that there was substantial evidence in the record to support the ALJ's conclusions that plaintiff's mental health complaints, including depression, anxiety, cognitive deficits in terms of memory and judgment difficulty (AR 372-73), were not established as severe impairments under the Act by the evidence in the case, that plaintiff had only slight mental deficits in terms of understanding, remembering and carrying out both simple and detailed work instructions, and was only slightly limited in using judgment in making simple work decisions, in responding appropriately to coworkers, supervisors and the public, and responding appropriately to changes in the routine work setting (AR 383), and that claimant is moderately limited in responding appropriately to work pressure (*id.*). Based on these conclusions, the ALJ did not err in finding that plaintiff's mental health did not prevent her from returning to past relevant work or working in other jobs.

  2. *Plaintiff's Physical RFC*

As noted above, the residual functional capacity for plaintiff established by the ALJ accepted some of the physical limitations suggested by Dr. Kassan, and rejected others.  Primarily, the ALJ rejected Dr, Kassan's limitations placed on plaintiff's ability to sit, stand and walk, and her ability to handle, finger and grasp.  She found, as noted above, that  plaintiff could sit for 6 hours in an 8 hour day with the opportunity to stand and stretch each hour and could stand and walk for 1 to 2 hours at a time (AR 383) and she made no findings as to limitations on plaintiff's ability to reach, finger, handle or push or pull.

In reaching her findings as to plaintiff's RFC, the ALJ relied on two residual functional capacity evaluations performed by consultative physicians, plaintiff's own testimony, and the medical records discussed above regarding her thumb surgeries, knee surgery, MRIs, EMGs and Dr. Kassan's treatments of her.

The RFC evaluation dated April 4, 2000 (AR 140-47), although acknowledging that plaintiff has minimal peripheral neuropathy, and minimal to mild tender points in her C-spine, L-spine and knees, opines that she can sit with normal breaks for 6 hours in an 8 hour workday, stand or walk 6 hours in an 8 hour workday, occasionally climb stairs, stoop, crouch and crawl, and places no limitations on her manipulative functions (AR 141-43). Were this the only medical evidence in the record, its vintage may cause its weight to be questioned in formulating plaintiff's RFC as of 2004, but the later RFC, and records of plaintiff's treating physicians and her own testimony tend to support the opinion.

A second RFC performed as of April 4, 2002 reports that plaintiff has the residual functional capacity to frequently lift 10 pounds, occasionally lift 20 pounds, sit for 6 hours in an 8 hour day with normal breaks, stand and walk for 6 hours in an 8 hour day with normal breaks, and placed no limitations on her manipulative functions (AR 755-58).

As noted above, although she had thumb surgery in 2002 and 2003, her surgeon specifically authorized plaintiff to resume crocheting in February 2003. Plaintiff testified at the hearing that while her hands had surgery and she has soreness in them, "they're okay." (AR 393). She testified that on a daily basis she makes her husband's breakfast

24

or lunch, does a load of laundry and washes some dishes (AR 395-96). She also testified that she attends church, plays cards (AR 394) and does crochet, as her doctor permitted, but for a limited amount of time of perhaps 10 minutes at a time, and up to an hour daily (AR 399).

In rejecting the credibility of some of plaintiff's self-described limitations, the ALJ pointed out that the medical records do not reflect the degree of limitation testified to (AR 377). The records from Drs. Fry and Greenberg, as summarized above, are consistent with the ALJ's observations that they do not reflect complaints about the level of pain described by plaintiff. The MRI from November 2001 and the EMG from December 2001 do not provide laboratory findings that support plaintiff's claims. In notes from the neurologic examination of December 21, 2003, Dr. London notes that plaintiff's recently performed MRI scan shows no "impressive abnormality" (AR 673). Moreover, as noted there are no objective medical findings to support the level of pain or discomfort claimed by plaintiff, nor a limitation that she could not perform sedentary work.

While it may be that plaintiff is limited somewhat in what she can do because she feels she is in pain or discomfort, the Tenth Circuit has said on a number of occasions that "disability requires more than mere inability to work without pain." *See e.g. Ray v. Bowen*, 865 F.2d 222, 225 (10th Cir. 1989). Plaintiff here testified that she could sit for 15 minutes and then needed to change positions (AR 392). In response to questions from her counsel, plaintiff testified that "shifting position . . . helps the pain stay away" (AR 397). Plaintiff here, like the plaintiff in *Ray*, *supra*, testified that she

25

was uncomfortable sitting unless she shifted position, but she did not testify that such

discomfort interfered with her ability to work in a seated position.  There is sufficient

evidence in the record to support the ALJ's finding that plaintiff could perform sedentary

work that can be performed sitting 6 hours in an 8 hour day with the opportunity to

stand and stretch as required.

> **D.    Whether There Is Sufficient Evidence To Show That Jobs Plaintiff
> Could Perform Existed In Significant Numbers In The Regional
> Economy**

Given the RFC described above, the ALJ found that plaintiff could not only

return to her past relevant work as a telephone triage nurse, but alternatively could

perform other jobs including food and beverage clerk and final assembler of optical

goods (AR 382, 383).  On appeal, plaintiff argues that even if she had the RFC to

perform such jobs, there was a dearth of evidence to support the ALJ's finding that

such positions exist in significant numbers in the regional economy (Plaintiff's Brief at

17).  For the reasons set forth below, the Court does not agree with plaintiff.

In response to a similar argument, the panel in *Trimiar v. Sullivan*, 966 F.2d 1326

(10th Cir. 1992), stated that "[t]his Circuit has never drawn a bright line establishing the

number of jobs necessary to constitute a 'significant number' and rejects the

opportunity to do so here.  Our reluctance stems from our belief that each case should

be evaluated on its individual merits."  966 F.2d at 1330.  The court went on to identify

several factors to consider in determining whether a job exists in significant numbers,

including "the level of claimant's disability; the reliability of the vocational expert's

testimony; the distance claimant is capable of traveling to engage in the assigned work;

the isolated nature of the jobs; the types and availability of such work." *Id.* However, plaintiff in the instant case does not argue that any of these factors undercut the ALJ's findings, but only that the numbers presented in the administrative record do not constitute a significant number of the identified jobs in the local Colorado economy (Plaintiff's Brief at 17).

Testifying at the April 20, 2004 hearing, the vocational expert stated, with respect to the food and beverage clerk position, that according to his data there were 142,000 positions in the United States, and approximately 2,000 in the State of Colorado, and with respect to the final optical goods assembler position, there were 104,000 positions in the United States, and approximately 1,200 in the State of Colorado (AR 410).

The VE subsequently provided the ALJ with answers to a written questionnaire regarding the number of food and beverage clerk positions, and stated that based on more recent census data there were 300 such jobs in the Colorado, as opposed to the 2,000 he testified to at the hearing (AR 445). Plaintiff argues that 300 such positions is not a significant number (Plaintiff's Brief at 17).

Plaintiff also argues that upon cross-examination at the hearing the VE conceded that the position he described as final assembler of optical goods actually included a "number of jobs" in a certain census code that included 51 different DOT titles, and that he was not aware of any specific optical goods assembly jobs in Colorado, thereby rendering the position lacking in significant numbers in the local economy (*id.*).

The Court does not read the VE's testimony to have the import suggested by plaintiff. On cross-examination the VE made clear that the numbers of jobs he identified in this category were for "all unskilled jobs within the census code that are sedentary" and that "there's no really [sic] reason why any one of these jobs would not be appropriate for claimant." (AR 411). As the VE explained, while he was "not specifically aware of" an optical goods assembly position in the State of Colorado, the reference to optical good assembler was just "an example" of one of the many positions he felt plaintiff could perform among the numerous unskilled sedentary jobs available among 51 different DOT titles (AR 412). Of those sedentary positions, he found there were 1,200 in Colorado (AR 410).

In *Trimiar* the panel did discuss the actual number of positions identified in that case by the vocational expert. *See* 966 F.2d at 1330, n.10. The panel there cumulated the number of jobs in each of the three positions identified by the vocational expert, and found that a range of 650 to 900 positions in the local economy could meet the test of a significant number. *Id.* Taking the 300 positions of food and beverage clerk, plus the 1,200 sedentary goods finishing jobs found by the vocational expert, this Court cannot say the record here lacked sufficient evidence to support the findings made by the ALJ. *See e.g. Carson v. Barnhart,* 140 Fed. Appx. 29 at *39 (10th Cir., July 5, 2005) (700 surveillance monitor jobs in Oklahoma is a significant number); *Cowan v. Department of Health & Human Services*, 986 F.2d 1426 (Table), 1993 WL 34740 at *2 (10th Cir., Feb. 9, 1993) (1,400 school bus driver jobs and 300 drip pumper jobs in Oklahoma found significant).

28

**CONCLUSION**

For the reasons set forth above, the Court finds that there is substantial evidence in the record to support the finding that plaintiff did not meet the definition of disabled, and therefore the Commissioner's decision is AFFIRMED.  The oral argument set for March 6, 2006 at 9:00 a.m. is VACATED.

DATED:  February 28, 2006

BY THE COURT:

*s/ Phillip S. Figa*
_____
Phillip S. Figa
United States District Judge